# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 30, 2012

No. 10-20262

Lyle W. Cayce
Clerk

CONTINENTAL CASUALTY CO.,

        Plaintiff-Third Party Defendant  -  Intervenor Defendant - Counter Claimant - Appellee - Cross Appellee - Cross Appellant

v.

NORTH AMERICAN CAPACITY INSURANCE CO,

        Defendant-Intervenor  - Defendant-Counter Claimant - Appellee - Cross Appellant - Cross Appellee

v.

COLUMBIA CASUALTY CO,

        Third Party Defendant Intervenor Defendant -Counter Claimant - Appellee Cross Appellee - Cross Appellant

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA,

        Intervenor Plaintiff - Third Party  - Plaintiff Counter Defendant - Appellant - Cross Appellee

Appeals from the United States District Court
for the Southern District of Texas

No. 10-20262

Before REAVLEY, GARZA, and SOUTHWICK, Circuit Judges.

REAVLEY, Circuit Judge:

Three primary insurers and one excess carrier appeal the district court's determination on summary judgment of their duties to defend a contractor who allegedly was responsible for a fire that occurred during construction. The district court held that the three primary insurers must split the costs initially spent by one of them defending the insured, while the excess insurer could not recover any of its defense costs from the primary insurers. We AFFIRM as to the allocation among the primary insurers of the initial defense costs, and REVERSE to award defense costs to the excess carrier.

## I. BACKGROUND AND PROCEDURAL HISTORY

Valero Refining Company contracted with Encompass Power Services to design, engineer, and construct a co-generation facility at Valero's oil refinery in Benicia, California. Encompass entered into a subcontract with ECCO Engineering & Construction Company to perform electrical work for the project.

For purposes of the Valero project, Encompass was a named insured on four insurance policies. First, Encompass maintained a primary commercial general liability ("CGL") policy issued by Continental Casualty Company that had a $1 million per occurrence limit with a $2 million general aggregate limit. Second, Encompass also carried a professional liability policy issued by Columbia Casualty Company. The Columbia policy had a $250,000 self-insured retention amount and a $20 million aggregate and per-claim limit. Third, Encompass had a commercial umbrella policy issued by National Union Fire Insurance Company that was excess to Encompass's primary CGL policies and provided a $25 million aggregate policy limit. Finally, Encompass was also an additional named insured in a CGL policy carried by ECCO as part of its subcontract with Encompass. That policy was issued by North American Capacity Insurance and provided $1 million per occurrence with a $2 million

2

No. 10-20262

general aggregate limit to Encompass for liability resulting from ECCO's work on the Valero project.

In May and June 2002, the Valero project experienced three separate power outages and a fire in the refinery that caused significant damage. Valero later alleged that Encompass and its subcontractors' negligence gave rise to the power outages, the third of which caused the fire. Valero sought over $40 million in damages from Encompass.

In November 2002, Encompass filed for Chapter 11 bankruptcy protection. In May 2003, the bankruptcy court approved a settlement agreement between Encompass and Valero ("the 2003 bankruptcy agreement") that allowed Encompass to receive payment from Valero for its work on the refinery project but also permitted a lifting of the automatic stay so that Valero could pursue its claims against Encompass. Valero paid $1.5 million to Encompass's bankruptcy estate and agreed not to seek any damages beyond what insurance policies would pay. In exchange, Encompass assigned Valero any rights and claims that it had against its insurers, to become effective only upon breach by the insurers. No liability was conceded to Valero, nor was the contractual obligation of Encompass's insurers impaired.

In June 2003, Valero invoked contractual arbitration against Encompass, alleging that Encompass's negligence in designing, engineering, and constructing the co-generation facility caused the power outages and ensuing fire. Continental provided the initial defense of Encompass during the early stages of arbitration. In 2004 and 2005, Columbia and North American denied they had any obligation of defense. Columbia maintained that its policy did not provide coverage because Encompass's conduct did not fall within its professional services clause and Encompass failed to satisfy its $250,000 self-insured retention limit prior to requesting coverage. North American contended that its policy was not implicated because ECCO's work did not

No. 10-20262

prompt the power outages or fire. North American also argued that even if there was coverage its policy was excess to Encompass's primary insurers.

In 2005, Continental filed a declaratory judgment action against North American in Texas state court, arguing that North American was obligated to defend Encompass as an additional insured under its policy with ECCO. North American removed the suit to federal court based on diversity. National Union intervened in December 2005 on the ground that it had an interest in the court's coverage determinations, and it later filed an amended complaint impleading Columbia.

On December 28, 2005, Encompass purported to assign to Valero all claims, including the right to demand a defense, that it had against Continental and Columbia that stemmed from the Valero project ("the 2005 assignment"). Its express purpose was to facilitate a settlement among Continental, Columbia, and Valero. Valero made no reciprocal promises to Encompass in the 2005 assignment. One day later, Continental and Columbia, together denominated as "CNA,"[1] agreed to a separate settlement with Valero ("the 2005 CNA-Valero agreement"). That settlement provided that Continental and Columbia would immediately pay Valero $3 million and guaranteed that Valero would be paid an additional $5.5 million. The payment would include Continental's $1 million CGL policy, with the remainder to come from amounts that Continental or Columbia recovered from other insurers or from subcontractors. In return, Valero purported to release Continental and Columbia from all claims against them. Again, no liability of Encompass was conceded nor was any contractual obligation of Encompass's insurers effectively impaired.

Continental claimed that the settlement had satisfied its duty to defend Encompass, while Columbia disclaimed any duty to defend or indemnify. On

---

[1] Continental and Columbia share a corporate parent.

4

No. 10-20262

December 30, 2005, Continental tendered Encompass's defense to the excess insurer, National Union, which took over the defense in January 2006 subject to a reservation of rights. National Union defended Encompass until 2007, when the arbitration was fully settled and Valero released all remaining claims stemming from the refinery fire. Continental, Columbia, North American, and National Union entered into a joint release agreement in which they resolved their duties to indemnify Encompass. Each reserved its claims against the others regarding the proper allocation of defense costs in the arbitration. By the time of the arbitration settlement, Continental had incurred approximately $2.7 million in defense costs and National Union had expended approximately $3 million.

After the arbitration concluded, the insurers filed opposing summary judgment motions in the instant litigation. The district court held that Columbia and North American were both primary insurers and were liable for paying one-third shares of the total amount that Continental had expended in Encompass's defense before turning the defense over to National Union. North American's share would be reduced, however, because Encompass did not request that North American defend it until November 4, 2004, after Continental began its defense.

The district court concluded that National Union was entitled to both contractual and equitable subrogation against the other three insurers as a result of taking over Encompass's defense. It also held, however, that National Union could not recover its defense costs as a subrogee, reasoning that the right of an insurer to recover through subrogation depends on "standing in the shoes" of the insured. The court held that Encompass assigned its defense rights under the insurance policies to Valero in the 2003 bankruptcy agreement, and then no longer could assert those rights and neither could National Union by way of subrogation. The court also held that National Union did not have a right to

5

contribution from the primary insurers because that remedy is available only among primary insurers–not excess insurers–who share a common duty to a shared insured.

The district court held that Encompass's attempted 2005 assignment of its rights was invalid because there was no consideration for it. Further, the court held that the 2005 CNA-Valero agreement did not relieve Continental of its duty to defend because it did not resolve the underlying dispute between Encompass and Valero but merely settled one insurer's financial obligation. Finally, the court also held that the agreement did not exhaust Continental's policy limits.

National Union now appeals, while Continental, Columbia, and North American cross-appeal. National Union seeks recovery of the money it expended on defense costs. The other three insurers defend against National Union's claim and appeal the district court's rulings regarding the distribution of the amount Continental spent defending Encompass.

## II. DISCUSSION

We review the district court's decisions on summary judgment de novo, applying the same legal standard as the district court. *See ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 515 (5th Cir. 2012). Summary judgment is appropriate if the moving party demonstrates there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The district court applied Texas law to analyze the insurance policies of Continental, Columbia, and National Union and applied California law to North American's policy. No party disputes these choices, and we accept them.

### A.  National Union's Appeal

National Union argues that the district court erroneously denied recovery of its defense costs from the primary insurers. It argues that it should have prevailed under theories of either contractual subrogation, equitable

No. 10-20262

subrogation, or contribution. It further argues that Encompass's purported assignment of its rights to Valero was invalid. The primary insurers contend that National Union was not entitled to subrogation because Encompass's assignment of its rights to Valero meant that National Union stepped into empty shoes. We agree that National Union should have been able to recover based on contractual subrogation.

Subrogation is the substitution of one party for another such that the new party may assert the rights of the substituted party. *See Argonaut Ins. Co. v. Allstate Ins. Co.*, 869 S.W.2d 537, 541 (Tex. App. 1993). The two most common types of subrogation are equitable and contractual. *See Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 256 (5th Cir. 2011). Equitable subrogation "arises in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007). Contractual subrogation, on the other hand, "is created by an agreement or contract that grants the right to pursue reimbursement from a third party in exchange for payment of a loss." *Id.* In the case of either equitable or contractual subrogation, "the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured." *Id.*

In *Mid-Continent*, two primary insurers whose policies contained pro rata clauses jointly defended and settled a negligence case against their insured for $1.5 million. *Id.* at 769–70. The two insurers contributed disproportionate amounts to the settlement because they differed on the settlement value of the case. One insurer paid $1.35 million while the other paid $150,000. *Id.* at 770. The higher-paying insurer sued the other company for reimbursement based on *inter alia* contractual subrogation. The Texas Supreme Court held that because

No. 10-20262

the insured had been fully indemnified, and therefore had no right of further recovery from anyone, the higher-paying insurer had no basis upon which to rest its subrogation claim. *Id.* at 775–76. The court explained that "[h]aving fully recovered its loss, an insured has no contractual rights that a co-insurer may assert against another co-insurer in subrogation." *Id.* at 776. In other words, the insurer could not assert a right that the insured no longer possessed and that had been extinguished.

The district court here relied in part on *Mid-Continent* to hold that, even though National Union paid for Encompass's defense when the primary insurers should have done so, and National Union's policy contained a subrogation clause, National Union was barred from recovering its costs under an "empty shoes" theory. The district court reasoned that Encompass's rights against the primary insurers passed to Valero by operation of the 2003 bankruptcy agreement, and therefore National Union could not assert Encompass's right to recover defense costs.[2]

Since the district court's decision in this case, we have recognized that the *Mid-Continent* bar to recovery is narrow and limited to the facts of that case. *See Peachtree*, 647 F.3d at 257; *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 306–07 (5th Cir. 2010). We have held that *Mid-Continent* applies in cases where "the insurers (1) were co-primary insurers; (2) did not dispute that both covered the loss; and (3) were subject to pro rata clauses." *Peachtree*, 647 F.3d at 258. In both *Peachtree* and *Amerisure*, we rejected a broad view of *Mid-Continent* and held that contractual subrogation is not barred simply because an

---

[2] The district court treated Encompass's shoes to be "empty" of the right to demand a defense by the time National union incurred defense costs because the 2003 agreement transferred the rights of defense effectively when Columbia and North American refused to defend. The 2003 agreement is better read only to serve the means of Valero to collect whatever it recovered against Encompass, and no breach of the "insurers" occurred because National Union did defend.

insured has been fully indemnified.   *See Peachtree*, 647 F.3d at 257–58; *Amerisure*, 611 F.3d at 307.   In other words, that the shoes of the insured are purportedly "empty" of rights against the primary carrier does not necessarily bar an excess insurer from recovering under a theory of subrogation from the primary carrier who should have paid its share of indemnity or defense costs. The facts of each case must be considered.   *See Mid-Continent*, 236 S.W.3d at 774 (applying "the particular facts" to the elements of subrogation).

In *Amerisure*, we distinguished the application of the *Mid-Continent* bar in cases where both insurers acknowledged their duties to defend and indemnify, thus fully protecting the insured.   *Amerisure*, 611 F.3d at 307.   Limiting *Mid-Continent* to those circumstances, we held, was faithful to Texas law "that dueling coinsurers must place the interests of their insureds before their own." *Id.* at 307–08 (citing *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 588–89 (Tex. 1969)).   In *Amerisure*, unlike *Mid-Continent*, the insurers did not agree on the duties to defend and indemnify.   Instead, the primary carrier in that case insisted that its policy was inapplicable, and the excess carrier refused to indemnify until the primary carrier paid its policy limit. *Id.* at 308.   The primary carrier did so but sought contractual subrogation after the underlying case was settled.   We concluded that the insured would not have been fully protected and that applying *Mid-Continent* to bar subrogation in those circumstances "would have further deviated from settled principles of Texas insurance law by discouraging insurers from first defending and indemnifying and then seeking reimbursement for the costs that a coinsurer should have paid." *Id.* (citing *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 703 (Tex. 2000)).   We held that the primary carrier thus could seek contractual subrogation from the excess carrier even though the insured ultimately had been fully indemnified.   *Id.*

No. 10-20262

Similar concerns animate the present case. The three primary carriers here refused to defend their insured, Encompass, in the midst of the arbitration, with two of the carriers denying any obligation to indemnify. With the insured left unprotected, National Union stepped in to take over the defense and incurred significant defense costs. National Union thus bore the costs of a defense to which Encompass was entitled from third parties.[3] National Union's policy with Encompass contains a subrogation clause that states: "If any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The Insured must do nothing after loss to impair these rights and must help us enforce them." Under the terms of the subrogation clause, National Union is entitled to reimbursement from the insurers who should have borne the costs that it paid.

The 2003 bankruptcy agreement and purported assignment relied upon by the district court to deny National Union's recovery do not change the result. That agreement provided that "Execution of this Agreement will also constitute an assignment of any and all rights and/or claims [Encompass] may have against its insurers under any policy providing coverage for the claims Valero may assert against [Encompass] which assignment shall become effective only in the event that such insurers breach their duty(ies) to defend and/or duty(ies) to indemnify Encompass[.]" We do not read this provision, as did the district court, to give away the right to demand a defense and preclude National Union from asserting its subrogation rights for covering the defense costs. Disallowing National Union to recover from the primary carriers when those carriers had an obligation to protect the insured would encourage the primary carriers to breach their duties to defend rather than place their insured's interests above their own by defending and seeking reimbursement later. *See Amerisure*, 611 F.3d at 308;

---

[3] We address, and reject, below various arguments by the primary carriers that they lacked a duty to defend.

*see also Hardware Dealers*, 444 S.W.2d at 589 (providing that "settled principles" of Texas law "give dominant consideration to the rights of the insured").

Moreover, despite the purported "settlement" in the 2003 bankruptcy agreement, that agreement did not resolve in any way Encompass's liability to Valero, which was not established until 2007 when the arbitration was finally settled. In the interim, Encompass proceeded with the arbitration, vigorously defended first by Continental and then by National Union. The 2003 bankruptcy agreement even contemplated that liability was still contested, specifically providing that "[t]he automatic stay which exists pursuant to 11 U.S.C. § 262 shall be lifted solely for the purpose and to the extent necessary to permit Valero to pursue any and all claims, actions and causes of action it may have against Encompass[.]" The purpose and effect of the assignment in the 2003 bankruptcy agreement was not to empty Encompass's shoes but rather to assist Valero in the collection of any judgment against Encompass should Valero ultimately prevail on liability. To this end, the agreement provided that "*to the extent that Valero is successful* on any or all such claims, Valero agrees that it will proceed with collection efforts on any judgment obtained, or settlement reached, only as to and against one or more of such insurance policies that provide coverage to Encompass[.]" (Emphasis added).

At all times, the primary insurers retained their contractual obligation to provide Encompass with a defense and Encompass retained the right to demand a defense. The district court believed that when the primary insurers breached their duties to defend Encompass, the insured's rights flowed to Valero by operation of the 2003 agreement. But, as noted above, that agreement also required Valero to obtain a favorable judgment, and Encompass was still defending the arbitration action in which Valero was pursuing such a judgment.[4]

---

[4] To read the assignment as did the district court results in the following impossible scenario: the insured demands a defense; the insurers refuse, thereby breaching their duties;

In other words, Encompass's right to demand a defense from the insurers who owed that defense could not flow to its adversary in the very action that it was actively contesting.[5]  Because National Union paid for the defense of that action when the primary insurers were obligated to the insured, National Union may enforce the contractual subrogation provision in its policy.  The 2003 assignment merely contemplated rights flowing to Valero *after* the primary insurers breached their duties and there was a liability judgment obtained in Valero's favor; it did nothing to alter the insured and insurers' subrogation relationship.[6]

The empty shoes analogy urged by the primary insurers is especially unsatisfying here.  To say that National Union may not recover for payment of costs that another should have paid because the insured had "empty shoes" makes too broad a conceptual leap under the circumstances.  Indeed, there will almost always be "empty shoes" when a court is dealing with the legal fiction of subrogation.  We could just as well turn to equitable subrogation, which employs "a legal fiction whereby an obligation, extinguished by a payment made by a third person, *is treated as still subsisting* for the benefit of this third person, so that by means of it one creditor is substituted to the rights, remedies, and securities of another."  *Day Cruises Maritime, L.L.C v. Christus Spohn Health Sys.*, 267 S.W.3d 42, 61 (Tex. App. 2008) (emphasis added) (internal quotation marks and citation omitted)); 68 TEX. JUR. 3d *Subrogation* § 12 (2012); *see also* Restatement (Third) of the Law of Restitution and Unjust Enrichment § 24

---

the right to demand a defense passes to the insured's adversary and may no longer be asserted by the insured.  Thus, the insured loses its right to a defense merely because the insurers refuse to defend.

[5] Moreover, at the time of the 2003 bankruptcy agreement, the arbitration action had not yet been filed, which further suggests that there was no intent by the parties that Encompass surrender its right to demand a defense.

[6] The same is true of the 2005 assignment, whereby Encompass purported to assign to Valero its claims against Continental and Columbia.  We agree with the district court's holding that this agreement was unsupported by consideration.

(2011). The subrogation claim is based on this fiction that the obligation to the creditor remains so that the third person may assert the creditor's rights. But in reality the creditor's expectations have been satisfied. In other words, the original creditor's shoes will be "empty" any time a third party makes a payment on his behalf and then seeks to recover under the fiction that the debt still exists to that creditor, yet this is not determinative of the payor's ability to recover under subrogation.

We hold that the district court erred when it determined that National Union was precluded from recovering its defense costs under a theory of contractual subrogation.

## B. Primary Duty to Defend

Our holding that National Union may recover from the primary insurers presupposes that each of those insurers was primarily liable for the cost of defending Encompass. In the course of defending National Union's appeal and prosecuting their respective cross-appeals, the primary insurers make several arguments as to why they did not have a primary duty to defend. We consider each primary insurer's policy with Encompass to determine its respective duties.

### 1. Continental and Columbia

As noted above Continental and Columbia entered into a single settlement with Valero in 2005, which they argue on appeal fully satisfied their obligations to Encompass. Continental argues that it exhausted its policy limit by spending $2.7 million on Encompass's defense and by contributing the full $1 million of coverage under its policy to the 2005 CNA-Valero settlement. Columbia argues that it had no duty to defend and that this settlement simply recognized that. We are unpersuaded.

Insurance policies are interpreted using the same rules governing other contracts. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008). Words are given their "plain meaning," and courts must

not insert "additional provisions into the contract." *Id.* "If the written instrument is worded so that it can be given only one reasonable construction, it will be enforced as written." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).

Encompass's policy with Continental provides that Continental's "right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements." The district court concluded that Continental's settlement with Valero did not satisfy the plain meaning of this provision because there was no judgment ending even part of the arbitration against Encompass. Furthermore, there was no settlement as intended by the policy because no lawsuit or dispute was ended. We agree.

In *Judwin Properties, Inc. v. United States Fire Insurance Company*, 973 F.2d 432, 433–34, 436 (5th Cir. 1992), we considered what was needed under Texas law to end an insurer's duty to defend under a policy provision that the insurer "shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements." We concluded that the insurer fulfilled its contract by settling all of the claims brought by a group of plaintiffs, even though the settlement was not with all of the plaintiffs in the suit. *Id.* at 436. The Texas Supreme Court made a similar ruling soon after our decision. *See Tex. Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 315 (Tex. 1994). It held "that when faced with a settlement demand arising out of multiple claims and inadequate proceeds, an insurer may enter into a reasonable settlement with one of the several claimants even though such settlement exhausts or diminishes the proceeds available to satisfy other claims." *Id.* (footnote omitted).

In the present case, Valero's claims against Encompass did not end with the 2005 CNA-Valero settlement but merely got an initial installment payment from one insurer. Indeed, the CNA-Valero agreement specifically provided that

No. 10-20262

"Valero shall, at its sole cost and expense *continue to prosecute to completion* its existing claims against Encompass." (Emphasis added).  The agreement further provided that "[n]othing in this Agreement shall be construed as limiting or impairing Encompass's or its insurers' ability to defend that action." Continental's million-dollar payment under the 2005 CNA-Valero settlement was not to be applied to an existing judgment but instead to some future judgment or global settlement, which did not finally occur until 15 months after the 2005 CNA-Valero settlement.  Continental's payment was thus not pursuant to a settlement or judgment as required by its policy.  We conclude that the district court's thorough analysis of this issue was correct.

With respect to Columbia's obligation to provide a defense, it argues that coverage under its policy never arose because Encompass failed to pay the required $250,000 self-insured retention amount.  Encompass's policy with Columbia provided that this amount "must be paid prior to any payment being made by us under the terms and conditions of this Policy of insurance." Columbia relies on a district court decision in which an insurer was not required to satisfy the insured's self-insured retention limit when the insured was in bankruptcy.  *See Pak-Mor Mfg. Co. v. Royal Surplus Lines Ins. Co.*, No. SA-05-CA-135-RF, 2005 WL 3487723 (W.D. Tex. Nov. 3, 2005).  The court there ruled that the insured was obligated to pay the self-insured retention limit under its policy.  *Id.* at *2.  Because the insured's bankruptcy prevented the payment, the insurance policy was not triggered.  *Id.* at *5-6.

Although it is undisputed that Encompass never paid its self-insured retention limit, the policy does not explicitly require the insured to pay the amount itself.  Both Continental and National Union spent millions of dollars on Encompass's defense, thereby satisfying the self-insured retention limit. Such a limit "represents the amount of the loss that the insured is responsible for before the coverage is triggered."  *See* 3 ALLAN D. WINDT, INS. CLAIMS &

15

No. 10-20262

DISPUTES § 11:31, at 11-498 (5th ed. 2010). Conversely, it is the part the insurer is not responsible for. Here, this responsibility was met on the insured's behalf. Therefore, Columbia's policy was triggered.

### 2. North American

North American argues that it owed no defense to Encompass because the allegations in Valero's complaint did not mention any involvement by ECCO, its insured. North American also argues that extrinsic facts demonstrate that ECCO's work did not lead to the damage at the refinery. Thus, it contends that the district court mistakenly held it was bound to defend Encompass against Valero's claims. We disagree.

Pursuant to California law, which controls North American's policy, an insurer's duty to defend is broader than the duty to indemnify, and it may be owed even in actions where damages are not ultimately awarded. *See Horace Mann Ins. Co. v. Barbara B.*, 846 P.2d 792, 795 (Cal. 1993). An insurance carrier "must defend a suit which potentially seeks damages within the coverage of the policy." *Id.* (emphasis, internal quotation marks and citation omitted). To determine if an insurer owes this duty, the court first "compar[es] the allegations of the complaint with the terms of the policy." *Id.* Extrinsic evidence, if available, may also assist in determining an insurer's duty to defend. *Ameron Int'l Corp. v. Ins. Co. of the State of Pa.*, 242 P.3d 1020, 1028 (Cal. 2010).

If "extrinsic evidence establishes that the ultimate question of coverage can be determined as a matter of law on undisputed facts," then that evidence may defeat the alleged duty to defend. *Montrose Chem. Corp. v. Superior Ct.*, 861 P.2d 1153, 1159 (Cal. 1993). That is, "where the extrinsic facts *eliminate the potential* for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability." *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 628 (Cal. 1995) (emphasis added). Thus, summary judgment is not proper if extrinsic evidence merely places coverage "in dispute;"

No. 10-20262

it must "eliminate the possibility" of coverage. *Vann v. Travelers Cos.*, 39 Cal. App. 4th 1610, 1615 (Cal. Ct. App. 1st Dist. 1995) (internal quotation marks and citation omitted).

The North American policy covers Encompass for any losses that take place as a result of ECCO's work. The policy sets out a duty to defend the insured based on these events. ECCO provided electrical subcontracting work for Encompass at Valero's Benicia refinery where the fire and work stoppage occurred. The work included installing wiring and other electrical components for the project. Valero alleged that the "incorrect design, engineering, and testing of electrical hardware by [Encompass] . . . and [its] *subcontractors* caused the faulty operation of Valero's electrical system and equipment," resulting in catastrophic power losses and significant damage from the fire. (Emphasis added).

Valero also claimed that "negligence of [Encompass] and its subcontractors" during installation of a protective electrical relay "interrutp[ed] power to two of the three main incoming electrical feeders to the plant," causing several million dollars in damages. Because North American's policy covered losses on the Valero project for which ECCO was responsible, these allegations gave rise to the possibility that its policy would be implicated. This is sufficient to trigger North American's duty to defend, absent extrinsic evidence definitively proving otherwise. *See Horace Mann*, 846 P.2d at 797.

North American argues that the complaint never mentioned ECCO, thereby raising no potential for coverage. However, the complaint alleged negligent electrical work by Encompass's subcontractors. The broadly construed duty to defend requires only that the policy *potentially* cover the loss, which the allegation here accomplished. *See id.* The specific pieces of extrinsic evidence to which North American points may blur the picture of ultimate liability, but they do not eliminate the possibility that ECCO's work caused the damage. *See*

17

*Waller*, 900 P.2d at 628. Therefore, the district court did not err by finding that North American owed Encompass a defense under its policy with ECCO.[7]

In sum, we hold that the district court correctly determined that each of the policies issued by Continental, Columbia, and North American was triggered by Valero's claims against Encompass and that all three insurers owed a primary duty to provide a complete defense.

## C. Continental, Columbia, and North American's Cross-Appeal

Whereas National Union's direct appeal concerns reimbursement for the defense costs it incurred after agreeing to defend in early 2006, the primary insurers' cross-appeals dispute the allocation of costs that Continental paid before it settled in December 2005. Continental and Columbia argue that the district court erroneously ordered North American to reimburse only one-third of Continental's defense costs because, according to them, their policies were

---

[7] In both the district court and this court, North American raised a number of defenses that pertained only to it and not to Continental and Columbia. We agree with the district court's resolution of those issues. North American argues that Encompass's assignment of its rights violated the anti-assignment clause in its insurance policy, thereby impairing its rights and ending any duty to defend. California courts have held that anti-assignment clauses in insurance contracts exist to "prevent an increase of risk and hazard of loss by a change of ownership without the knowledge of the insurer." *Westoil Terminals Co. v. Harbor Ins. Co.*, 73 Cal. App. 4th 634, 641–42 (Cal. Ct. App. 2d Dist. 1999) (internal quotation marks and citation omitted). If an insured assigns a right under the policy after a loss occurs, it does not "in any fashion increase the risk to" an insurer. *Id.* at 642. The loss here occurred in 2002. Encompass executed the assignment in 2003, but by the terms of the assignment it did not take effect until North American breached the contract in 2005. To the extent that Encompass assigned any viable rights in the agreement, that assignment did not increase the risk to North American because it took place after the loss.

Similarly, an anti-impairment clause in North American's policy is not at issue in this case. North American maintains that Encompass's 2003 assignment violated this clause because it impaired North American's ability to recover from the other insurers. This appeal concerns only defense costs borne by National Union and Continental, towards which North American has not contributed. North American has failed to identify how the assignment impaired its rights to recover costs that it did not expend. Therefore, this clause is not implicated. North American waived its argument that National Union failed to plead subrogation properly because it failed to raise any challenge to the sufficiency of the pleadings in the district court. *Celanese Corp. v. Martin K. Eby Constr. Co.*, 620 F.3d 529, 531 (5th Cir. 2010).

excess to North American's policy. North American, in turn, contends that its policy was excess to the Continental and Columbia policies, and that the district court erred by finding it was a primary insurer for Encompass. We must consider the scope of coverage provided by the insurance policies, and decide whether the district court correctly divided Continental's cost between all three primary insurers.

The Continental policy states:

> If any other valid and collectible insurance is available to the Insured for a loss we cover under coverages A. or B. of this Coverage Part, this insurance is excess over any of the Other Insurance, whether primary, excess, contingent, or on any other basis.
>
> When this insurance is excess, we will have no duty under coverage A. or B. to defend any claim or "Suit" that any other Insurer has a duty to defend. If no other Insurer defends, we will undertake to do so, but we will be entitled to the Insured's rights against all those other Insurers.

The Columbia policy provides:

> If there is other collectible insurance, including but not limited to project specific insurance, that applies to a claim covered by this Policy, the other insurance must pay first and this Policy is excess over the other insurance. This Policy applies to the amount of the claim that exceeds the available limit of liability and any deductibles or retention amounts of the other insurance.

In relevant part, the North American policy indicates:

> Coverage provided by this policy to the Additional Insured(s) shown in the Schedule shall be primary insurance and any other insurance maintained by the Additional Insured(s) shall be excess and non-contributory, but only as respects any claim or liability determined to be the result of the sole negligence or responsibility of the Named Insured and only if required of the Named Insured by written contract.

No. 10-20262

Each policy effectively passes liability for the same coverage-triggering incident onto a different primary insurer. The district court noted that the three policies conflicted, which the parties fail to address in their briefs.

"When, from the point of view of the insured, she has coverage from either one of two policies but for the other, and each contains a provision which is reasonably subject to a construction that it conflicts with a provision in the other concurrent insurance, there is a conflict in the provisions." *Hardware Dealers*, 444 S.W.2d at 589. If the policies conflict, the court may ignore the "offending provisions" and look to the remainder of the policies to determine which policy should provide coverage. *Id.* If both policies provide coverage, and priority is uncertain, liability is prorated between the insurers. *Id.* at 590.

Because the three policies conflict, we excise the conflicting language and look to the remainder of their language to determine if any policy should provide sole primary insurance to Encompass. Each policy provides for primary defense of Encompass based on the allegations in Valero's complaint. The Continental policy states that it has the "duty to defend the insured against any 'suit' seeking" damages as a result of property damage. North American's policy contains nearly identical language. The Columbia policy indicates that it would "defend any claim made against [Encompass] seeking amounts that are payable under the terms of this Policy." Each policy provided complete, primary coverage to Encompass. Therefore, the district court's decision to prorate the defense costs equally among the three primary insurers was correct. *See id.*

### III. CONCLUSION

National Union may seek reimbursement for its defense costs from Continental, Columbia, and North American through contractual subrogation. The district court did not err in its allocation of Continental's defense costs among Continental, Columbia, and North American. We therefore affirm the

No. 10-20262

district court's judgment in part and reverse in part, and we remand for further proceedings consistent with this opinion.

AFFIRMED IN PART and REVERSED IN PART; REMANDED.